HATTIE M. SPILLER, ADMINISTRATRIX OF THE ESTATE OF NAPOLEON B. CUIE, DECEASED, RESPONDENT, v. THE WASHINGTON NATIONAL INSURANCE COMPANY, A CORPORATION, APPELLANT.—206 S. W. 2d 581.

Kansas City Court of Appeals. Opinion delivered November 10, 1947.

*Keyes & Bushman* for appellant.

228

*Lauf & Bond, H. P. Lauf, John O. Bond,* for respondent.

BLAND, J.—This is an action on a policy of accident insurance. There was a verdict in favor of plaintiff in the sum of $630.60, and defendant has appealed.

The facts show that in January 1934 the defendant issued an accident insurance policy, limited in its terms, to one Napoleon B. Cuie, of Jefferson City, payable to the estate of the insured, by which it promised, among other things, to pay for the loss of the life of insured "by burning of a dwelling house, hotel, theater, office building, lodge room, club house, school building, store, church or barn while the Insured is therein and provided the Insured is therein at the beginning of the fire and is burned by such fire or suffocated by the smoke therefrom".

Insured lost his life on November 12, 1945 by being suffocated as a result of a fire in the building where he was employed, known as 227 Madison Street in Jefferson City. Plaintiff brought this suit on the theory that the building in which insured lost his life was an office building within the meaning of the policy.

The building in controversy was of two stories and occupied by tenants, the first floor being occupied by a saloon and the second story by the Order of Odd Fellows, a fraternal organization. The saloon consisted of a room 24 or 25 feet wide by 90 or 95 feet long. There was a long bar in this room and a small platform where entertainers perform. At the rear of the saloon there was a partitioned

space about 8 feet wide and 14 or 15 feet long which was used by the proprietor of the saloon as an office. In this room there was a desk, account books, a telephone and business records. He employed a bookkeeper who came once a week and spent two or three hours in the office each time working on his books. The insured was employed by the saloon keeper as a janitor. The upstairs part of the building had a different entrance than the downstairs and it was known as 227½ Madison Street. The upstairs was composed of a main or lodge room 26 x 55 feet. There was an anteroom in the front of the lodge room at the head of the stairs, also known as a lounge or reception room, which the Odd Fellows used as an anteroom or reception room for candidates before their initiation. This room was about 15 feet wide and 25 or 26 feet deep. There was also a dining room and a kitchen room on this floor. The dining room being 26 x 27 feet square and the kitchen about 18 x 12 feet.

The Odd Fellows rented the premises to other organizations for meetings. These organizations were the Rebeccas, the Veterans of Foreign Wars and the auxiliary to the veterans, the Brotherhood of Locomotive Firemen and Engineers and its auxiliary, the Brotherhood of Railroad Trainmen, the Carpenters' Union, the Security Benefit Association, the Order of Railroad Conductors and the Spanish War Veterans. These various organizations met at stated periods. The premises were rented every night and some afternoons. They were known as the "Odd Fellows Hall."

The character of the use made by these various organizations of the premises is shown as to some of them but not as to all.

Mr. Walter L. Gordon, a witness for the plaintiff, testified that he is the recording secretary of the Odd Fellows; that the Odd Fellows is a fraternal organization which performs certain rituals; that in the building on the second floor it has lodge furnishings; that in the lodge room there is a dais or raised desk or altars and stations for the various officers and poles with emblems on them; that the organization has no insurance feature; that there is a desk and a safe in the lodge room and lockers in the anteroom or reception room; that the lodge transacts all of its business on the premises, collects dues, allows bills, writes minutes and transacts any other business that might come before the organization; that ballots are taken there and members accepted or rejected and degrees conferred; that social events would take place there; that he is always there on meeting nights and sometimes in between; that the lodge has no other place to transact its business. He further testified that most of the committees of the Odd Fellows meet in the anteroom; that initiation fees are collected there; that there are committee meetings there and "they have to do with some pretty important affairs—such as contemplating a new building."

Mr. George H. Edwards testified that he is the financial secretary of the Odd Fellows; that it had been the lessee of the second floor of the building for 8 years prior to the fire; that he collects dues on the premises, keeps records, issues receipts for dues; that the lodge has no other place to transact its business; that all of its business is transacted on the premises; that all of the books and records of the organization are kept there. On cross-examination he testified that once in awhile a member would pay him dues on the street; that he instructed the post office to deliver the lodge mail to him at his private office as he is only on the lodge premises once or twice a week; that he writes all receipts on Wednesday night at the lodge meeting in the lodge hall and enters them in the ledger and turns them over to the treasurer. He further testified that the lodge has no rooms that are rented to lawyers or doctors. Asked if it rented any rooms to an insurance agency, he replied: ''Not unless you call the Security Benefit Association an agency''; that it did not rent any specific room to the Security Benefit Association but ''they used the whole place''; that there is not only a desk in the main lodge room but one in the anteroom belonging to the Carpenters; that so far as he knew no organization using the premises kept a stenographer or secretary; that there were no separate office rooms connected with the premises; that the building is not open all day for the conduct of business; that ''some mornings there is no meeting there''; that each organization has a key to the building and ''can enter it at their will''; that ''they can go in there any time they want to if it is to get something out of their lockers or anything''.

Mrs. Matt Lutkewitte testified that she is a member of the Ladies' Auxiliary of the Veterans of Foreign Wars; that this organization holds its meetings on the second floor of the building in question; that their organization is fraternal; that when it has its business meeting it is opened with ''some kind of ceremony''; that ''it is purely lodge''. She testified that she is secretary and treasurer. She further testified that all business of the organization was transacted on the premises; that the organization had no other place to meet or transact any business; that there are two desks available for the organization to use on the premises; that the purpose of the organization is ''to help the crippled soldiers and the hospitals'' for veterans; that it raises money by entertainment such as card parties and conducts a Poppy Sale on the streets; that all of its business is transacted at the place in question and it has lockers and a space for its records on the premises; that all of its arrangements and decisions are made there with reference to the Poppy Sales, in fact, all of its business is conducted on the premises.

Mrs. Robert Cunningham testified that she is a member of the organization known as the Rebeccas which is the ''sister organization of the Independent Order of Odd Fellows''; that the Rebeccas

is a fraternal organization; that the Rebeccas transact all of its business "up in the lodge hall"; that she is the financial secretary of the Rebeccas and keeps all of her records in the safe and desk at the lodge; that the Rebeccas kept no secretary or stenographer on the premises.

Mrs. Ralph Asel testified that she is a member of the Ladies' Auxiliary of the Veterans of Foreign Wars; that this is a fraternal organization with ritualistic work and does not have any insurance feature; that all plans and business arrangements concerning anything that the auxiliary is interested in are made on the premises in question; that the organization has no other place to conduct any of its business; that she is paid a salary of fifty cents per month as secretary and treasurer of the organization; that it has locker space on the premises; that "everything was kept in our lockers"; that "everything was written up there, our bills are passed on and all of our business is transacted up there".

Mrs. Elizabeth Hunter testified that she is a member of the Ladies' Auxiliary of the Veterans of Foreign Wars; that all of the business of this organization is transacted on the premises in question; that they collect dues there and receipt for the same "paying out bills and sending on our dues to state and national. I was treasurer of the organization"; that the organization has desk and locker space where it keeps all of its books and other supplies; that all of her duties are transacted "in the lodge room"; that she paid $1.00 a month for the performance of the work as secretary and treasurer of the organization.

Mrs. William Tanner testified that she is a member of the Ladies' Auxiliary of the Veterans of Foreign Wars; that she is also a member of the Auxiliary of Brotherhood of Railroad Trainmen; that "we have very little fraternal work. We belong to the Ladies' Auxiliary of the Brotherhood of Railroad Trainmen for the purpose of insurance"; that the Brotherhood of Railroad Trainmen conduct an insurance business; that its business is transacted on the premises in question, as well as that of the Auxiliary; that the Auxiliary of the Trainmen uses the hall in question for its meetings and it receives applications for membership there, initiates its members and delivers insurance policies to its members there; that dues are received there, bills paid and the books audited and reports made; that neither the Brotherhood of Railroad Trainmen or the Auxiliary has any other place to transact its business save on the premises in question; that the auxiliary has a locker and desk space there and that the auxiliary of the Veterans of Foreign Wars not only holds its meetings on the premises but that some State Conventions of the organization had been held there and transacted its business on the premises at the time; that the auxiliary of the trainmen meets twice a month; that "there is an opening service there, there is no floor work outside of

the flag being presented''; that the auxiliary is an insurance organization and is known as ''Capital Lodge Number 256 Ladies' Auxiliary to the Brotherhood of Railroad Trainmen''; that the policies are written in Columbus, Ohio and they are delivered to the members on the premises of the lodge; that the secretary and treasurer is authorized to sign the policies; that only members of the organization are offered insurance; that the members must pass a physical examination before the policy is issued; that these examinations are conducted in the doctor's office; that ''we have a medical examiner''. There is no evidence that the doctor had an office on the premises in question.

Ernest Kocher testified that he is the quartermaster, a position similar to that of Treasurer, in the local VFW; that it holds meetings on the premises in question and transacts all of its business there; that these meetings are held twice a month; that it has lockers assigned to it for its use; that the local organization had between 700 and 800 members; that on account of the large membership he had to transact some of its business at his home; that he was allowed fifteen cents a member compensation for his services; that the organization is to promote comradeship and that it ''seeks to better our own conditions for all service men''; that it has flags, pictures and paraphernalia which are stored on the premises; that it also has an insurance feature.

Mrs. Arthur Vogt testified that she is the financier and district assistant manager of the Security Benefit Association; that ''it is a benefit association. We sell insurance policies. That is just about all. Of course, we have a fraternal side of it, just for members. We have meetings up there'', that is on the premises in question; that the organization has no other meeting place; that the applications are taken in the homes then conveyed to the meetings in the lodge hall and there passed upon at the meetings and dues are collected at the hall; that policies are executed at the home office in Topeka, returned and delivered to the members at the meetings; that all of the business connected with the local lodge is transacted on the premises in question and it has there locker space for its records and checks are written there; that as a rule policies for life insurance are mailed direct to the parties; that ''if they are living out of town they mail them to him, otherwise I have to deliver them''; that sometimes we deliver the policies at the meetings; that the organization meets twice a month; that ''we have our regular meetings, yes, on those nights''; that they go out and solicit members; that ''we couldn't bring them in the lodge hall until they are members''; that not all premiums and payments are made at the hall, ''I have some mailed to me'' (at her home); that the local organization has no stenographer, just a secretary.

All the testimony relative to the character of the building in question was introduced on behalf of the plaintiff.

Plaintiff has filed a motion to dismiss the appeal on the ground that the defendant has failed to comply with Rule 1.08, in that its brief does not contain a proper statement. It is claimed that, nowhere in the statement, is any reference made to the transcript, which consists of 172 pages, in violation of the rule requiring that specific page references shall be made to the transcript. Plaintiff also contends that the statement consists of defendant's conclusions, is argumentative and fails to designate which party in the trial below presented certain evidence which it attempts to relate; that the statement fails to inform the court where the policy provisions can be found in the transcript; that the statement fails to reveal the necessary procedural steps to be taken for an appeal and fails to set forth and omits the evidence, which the appellant complains was erroneously admitted on the part of the court and evidence erroneously excluded by the court.

There is no reference to specific pages in the transcript where the evidence can be found which is set forth in defendant's statement. However, under the heading ''Argument'' ample reference to the pages of the transcript are made with the exception that nowhere in defendant's brief is the page given where the policy appears. However, this information appears in the statement in respondent's brief. Defendant's brief is not fairly subject to the complaint that it consists of conclusions and argument. In a statement of facts ultimate facts should be stated and not the testimony of witnesses as plaintiff seems to think. Defendant's brief does not rely upon conclusions of law as a substitute for a statement of ultimate facts. It may not be as complete a statement as plaintiff would desire but it gives a fair picture of the facts in the case and it, together with the very excellent statement made by plaintiff in her brief, affords us a clear understanding of the facts.

Defendant's statement recites that there was a verdict and judgment in favor of plaintiff in the sum of $630.60, after which defendant filed its motion to correct and modify the verdict and judgment, and motion in the alternative to set aside the verdict and judgment and to enter judgment in accordance with the defendant's motion for a directed verdict, or for a new trial, all of which were overruled by the court; that defendant, in due time, filed its appeal in this court.

The statement cannot be successfully criticized on the ground that it does not reveal the necessary procedural steps to be taken for an appeal. The complaint that the statement fails to set forth evidence which defendant complains was erroneously omitted and that which was erroneously excluded cannot be upheld because these matters appear under the heading ''Points and Authorities'' and, under the heading, ''Argument'' these points are further discussed. While the

statement may not be literally in compliance with the rule it, together with the statement of the plaintiff, gives us a clear understanding of the case and, as the rules contemplate the disposition of appealed cases on their merits rather than their dismissal on technicalities, we are of the opinion that the motion to dismiss the appeal should be overruled, and it is so ordered. (Brown v. Citizens State Bank, 134 S.W.(2nd) 116; Fields v. Equit. Life Assur. Society of U. S., 118 S.W.(2nd) 521; Menke v. Farmers Produce Exchange Co-Operative Association, 101 S.W.(2nd) 508; Whealen v. St. Louis Soft Ball Association, 202 S.W.(2nd) 891, 893.)

Defendant contends that the court erred in refusing its motion for a directed verdict, for the reason that the building, as a matter of law, was not an office building within the meaning of the policy. There is no question but that the term "office building" as contained in the policy is an ambiguous one. (Pritchard v. National Protective Ins. Co., 200 S.W.(2nd) 540.) In that case we said, l.c. 544: "Where such a term is used, as in the present case, without qualification, its meaning and application are subject to any fair and reasonable interpretation consistent with the language used and with the facts and circumstances surrounding the parties at the time of the execution of the policy and at the time of the casualty".

So the question is whether there is any evidence from which the building in question can be reasonably said to be an office building. There is no question but that the arrangement of the building shows that it was not intended to be an office building. The first floor consisted of a saloon and a small room partitioned off in the rear by the proprietor which was used as an office. There is no evidence that the office was used by him for any of his affairs not connected with the saloon's business. The designation of this room and the use made of it no doubt constituted an office. Because there was an office in the premises does not necessarily indicate that the building in which the office is located was an office building. If it did it would be reasonable to hold that department store buildings, mail order house buildings, hotels, theaters and, in fact, all buildings wherein business activity is conducted, are office buildings because in a portion of the building may be situated an office where the books and records are kept and the necessary clerical work incident to the business is done. Under no construction, however liberal, could such a conclusion be reached.

The use of the second floor was not substantially different in character so far as its being used as an office building is concerned than that of the first floor. The second floor was used and rented out primarily as lodge quarters. It was known as the IOOF Hall and is referred to in the evidence as the "Lodge". Of course, all organizations, such as lodges have business to transact such as collecting dues and paying bills, initiating members and, if it has an insurance feature, the business connected with the insurance. But these clerical activi-

ties are merely incidental and necessary to the organization, itself, which in most instances in the case at bar were of a fraternal character. Plaintiff insists that at least in two instances—that of the Trainmen and the Security Benefit Association—tenants in the building were engaged exclusively in the writing of insurance. There is evidence which would afford an inference that this was primarily their business, but even these organizations held regular meetings and the evidence would indicate they have lodge features. The evidence clearly shows that the use of the second floor of the building was for fraternal lodge purposes and not for the selling of insurance, exclusively. None of these organizations had any regular offices on the premises. They had no representatives who stayed there during all business hours of the day for the purpose of transacting business. While it is true all of them had keys and could enter the premises at will, (though no doubt not in the part being used by some other organization at the time) as before stated, no regular offices were maintained by any organization on the premises. In fact, no part of the premises on the second floor of the building was designed for office purposes. The physical arrangement of the building no doubt would not be conclusive as to the character of the building. The use to which it was put would be an important element in determining whether the building was an office building. We are unable to find any evidence that the dominant use of the building was that of an office building, if, in fact, it was so used by any person or organization. Being of the opinion that there is no substantial evidence that the building in question was an office building, we conclude that the court should have sustained defendant's motion for a directed verdict. (F. W. Woolworth Co. v. Davis, 41 Fed. (2nd) 342, 344; Dunn v. National Casualty Co., 5 NYS (2nd) 699.

The judgment is reversed. All concur.